# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 2:07-CR-00135-KJD-LRL |
| v. | **ORDER** |
| DEBORAH MARTINEZ SELDON, | |
| Defendant. | |

Before the Court is Defendant Deborah Martinez Seldon's ("Defendant") Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (#345). Also before the Court is Defendant's Amended Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 (#391). The Government responded to both motions (#415) and Defendant replied (#428). Also before the Court are Defendant's Motions for Certificate of Appealability (##386, 387). In resolving these motions, the Court not only relied on the parties' arguments and its own clear recollections, but also reviewed the entirety of the trial transcript, totaling some 2,300 pages.

However, prior to addressing the substance of this motion, the Court must address its troubling form. Because there are no local rules governing the form of 28 U.S.C. § 2255 motions, the motion is required to "substantially follow the form appended" to the Rules Governing § 2255

1  Proceedings. Rule 2(c). This form requires the statement of a distinct ground for relief, followed by a
2  statement of the facts which support that particular ground. Where more than one ground is asserted,
3  each discrete ground is to be listed and supported individually. This template is followed by *pro se*
4  prisoners across the country. The present motion does not. A variety of grounds for relief are simply
5  strung together in a "single" ground, and movant's twelve pages of "facts" can be charitably
6  characterized as "stream-of-consciousness." At bottom, it is unclear precisely what grounds are being
7  asserted, and which facts purportedly support each ground. Such deficient performance is particularly
8  troubling as the motion was prepared by a licenced member of the Bar, Lisa A. Rasmussen, Nevada
9  Bar No. 7491.
10     It must be further noted that the motion is often confusing, and even nonsensical. For
11 example, "[Defendant] would have testified that she would not let patients obtain prescription refills
12 without a prescription, contrary to what Dr. Seldon would do" (#345 at 14).[1] "[Defendant] was
13 stripped of her desire to try to negotiate her case by giving evidence adverse to Dr. Seldon."[2] "What
14 is interesting, and not in a good way, is that the jury was disturbed that [Defendant] would be married
15 to him yet not wear a wedding ring."[3] Nevertheless, the Court will address the substance of this
16 motion to the extent possible.
17 ///
18 ///
19 ///
20

---

21    [1]To be clear, in addition to the irrelevance of the proposed testimony, the Seldons ran a medical practice, not a
22 pharmacy.

23    [2]No evidence adverse to Dr. Seldon was ever given, and Defendant maintains that she desired to negotiate her
   case throughout the entire pre-trial and trial phases.

24    [3]Beyond its irrelevance, this statement is contradicted by Mr. Palazzo "[Defendant] wore another wedding ring
25 at trial in the place of the ring that was provided to counsel as an offset against fees owed to the Firm." (#415 Ex. E at
   ¶15).
26

I. Conflict of Interest

    A. Legal Standard

"[A] defendant who raised no objection at trial must demonstrate . . . an actual conflict of interest[.]" Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). If an actual conflict affected counsel's performance, "prejudice is presumed." United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005). However, "the possibility of conflict is insufficient to impugn a criminal conviction." Cuyler, 446 U.S. at 350. Stated differently, mere theoretical division of loyalties is not enough. Mickens v. Taylor, 535 U.S. 162, 163 (2002).

"An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Taylor, 535 U.S. at 172 n.5. In the Ninth Circuit, a conflict *exists* where "there was a basis for the interests of attorney and client to diverge with respect to any material issue or course of action-that is, that counsel actively represented conflicting interests." United States v. Baker, 256 F.3d 855, 860 (9th Cir. 2001). A conflict *adversely affects* counsel's performance if there was "some plausible alternative defense strategy or tactic might have been pursued but was not and . . . the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Wells, 394 F.3d at 733. Lastly, "[a]bsent special circumstances . . . trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Cuyler, 446 U.S. at 346-47 (1980).

Here, no party objected to Palazzo's representation of Defendant during the trial, requiring that Defendant show an "actual conflict" to obtain relief. As for whether an actual conflict existed, Defendant states that Palazzo's best friend was Mr. Seldon's counsel, and Mr. Palazzo does not contradict that point. Defendant also states that Mr. Richards made repeated sexual advances on her prior to and during the trial. While such behavior is unethical and unprofessional, it is irrelevant to whether a conflict of interest existed between Defendant and her counsel, Mr. Palazzo. Futher,

3

Defendant is a sophisticated business woman who successfully ran a medical practice until she broke the law. The Court finds it strange that such a woman would not immediately alert the Court to such offensive behavior. Here, Defendant waited more than 18 months after judgment was entered to alert the Court, and did so in the form of a petition for habeus relief. Such timing does not inspire confidence in Defendant's claims.

Returning to whether a conflict existed, Defendant states that Palazzo received medication from Mr. Seldon, and Mr. Palazzo confirms that on one occasion he was prescribed generic Ambien® by Mr. Seldon. Defendant also infers that Mr. Seldon would not pay for Mrs. Seldon's attorney if she was going to testify against Mr. Seldon. However, no evidence suggests that Defendant was incapable of hiring and paying for her own attorney. Further, if for some reason Defendant could not afford an attorney, one would have been appointed for her. Unfortunately, Defendant's statements regarding the retention of counsel are particularly muddled. Defendant claims that the attorney fees were paid from Mr. Seldon's medical practice general account (#345 at 7) and that she was dependent on Mr. Seldon's funds (#345 at 13). Then she claims that Mr. Palazzo was paid in part with Defendant's wedding ring and that Mr. Seldon stole Defendant's jewelry to pay attorney fees (#345 at 8). Accordingly, although it appears unlikely to the Court that a conflict existed in this case, the record before the Court is not conclusive on this point.

As a result, a pivotal question remains; whether there was a plausible alternative defense strategy which was not taken due to this possible conflict. The answer is a resounding no.

A. Blaming Mr. Seldon

Defendant's primary proposed strategy is to disavow any knowledge regarding the offenses in question and to place all blame solely upon Mr. Seldon. However, as the Ninth Circuit noted, the evidence of Defendant's guilt is "overwhelming." (#312 at 4). A few highlights will illustrate this point.

4

1    Toxin Research International, the purveyor of TRItox sent a fax "attention to Debbie Seldon
2 in Dr. Seldon's Office" stating "We received your orders for more . . . Botulinum toxin Type A"
3 (#261 at 384). That same fax continued "As soon as we receive your outstanding check and a check
4 for your new order we will ship out immediately" (#261 at 385). Around the time of the fax, no
5 fewer than 15 separate transaction invoices were sent from TRItox to the Seldons (#261 at 387-392).
6    James Bundy, an employee at the Seldon's office testified that Defendant was "looking for
7 another form of Botox®" (#268 at 1022). This "other" Botox® began arriving (#268 at 1023). It was
8 known in the office as "the other Botox®" (#268 at 1038). It was brought into the office "inside a
9 sandwich plastic baggy with regular ice cubes," and was brought exclusively by Al Aporff,
10 Defendant's father (#268 at 1024). Mr. Bundy also testified that Defendant claimed to have
11 purchased "about $50,000 worth of equipment" from the owner of TRItox, but Mr. Bundy "never
12 saw any equipment" (#268 at 1026). Further, while Defendant and Dr. Seldon were away, Mr. Bundy
13 was to request more of the "other Botox®" from Defendant's father if supplies ran low (#268 at
14 1036).
15    Following the FBI's search of the Seldon's business, Defendant warned the employees "not
16 to talk to anybody otherwise [the employees] would lose [their] jobs" (#268 at 1045). Subsequently,
17 Mr. Bundy overheard Mr. Aporff's girlfriend tell Defendant to "get the shit out of the house, that she
18 did not want to lose her house" (#268 at 1048). Defendant then sent a two-page fax which was
19 admitted as evidence, detailing tasks to be done at the office (#268 at 1055). Among other
20 instructions were "I want all financial weekly sheets out of the office" and "All bank statements for
21 each account together rubberbanded [sic] and in a box and, not at the office anymore" (#268 at
22 1057). Also included was "Order Botox from Barry's source that said they had for re-sale recently"
23 (#268 at 1057). And "Everything that you think shouldn't be in the office removed" (#268 at 1057).
24 Mr. Seldon verified that this list was written in Defendant's handwriting (#270 at 2142).

1    Todd Livdahl ("Todd"), a computer technician and brother to TRItox founder Chad Livdahl,
2 testified that Defendant asked him to alter the patient database, replacing instances of the word
3 "Botox®" with "cosmetic procedure" or something similar (#265 at 692). It was Defendant who let
4 the Livdahl brothers into the office to alter the patient records (#269 at 1564). When Todd
5 encountered a roadblock with the programming, Defendant referred him an outside computer
6 consultant with knowledge of the program (#265 at 715-16). Throughout his testimony, Todd was
7 quite clear that his directions came from Defendant (#265 at 715, 718, 722) see also (#269 at 1565).
8 According to Todd, "Debbie kinda owned the office. She ran the office. She made all the decisions."
9 (#265 at 719). Mr. Seldon largely agreed (#270 at 2131-32).

10    When an Allergan (the producer of Botox®) representative visited the office, it was
11 Defendant who represented the office (#265 at 811). When Chad Livdahl ("Chad"), founder of
12 TRItox presented a training at the Seldon's office where TRItox was discussed, Defendant was there
13 (#269 at 1522-23). In fact, Chad was a house-guest at Defendant's residence from time to time (#269
14 at 1527, 1558). Chad further testified that Defendant told him that the Seldons had cancelled their
15 relationship with Allergan (#269 at 1529). When Mr. Seldon spoke at conferences promoting
16 TRItox, Defendant was not only present, but actively participated in the preparation stages and
17 brought empty Botox® boxes "just to cover ourselves" (#269 at 1537-39, 1542).

18    When Defendant called Chad to order more TRItox after Chad's business had been searched,
19 Chad encouraged her to come to Tucson immediately so they "can do somethin'" (#269 at 1544-45).
20 Defendant flew to Tucson that night (#269 at 1546, #270 at 2129). Upon picking Defendant up from
21 the airport, Chad held up a sign warning Defendant against saying anything (#269 at 1547). Upon
22 reaching their destination, Defendant was "patted down" to ensure she was not wearing "a wire" and
23 told to leave her purse in the car (#269 at 1547-48). Defendant subsequently discussed the search of
24 Chad's place of business and strategies for avoiding similar problems at the Seldon's place of
25 business (#269 at 1549-51).

26

1    Upon a subsequent trip to Las Vegas, Chad arranged to sell more TRItox to Defendant,
2 despite his obvious legal troubles stemming from TRItox. (#269 at 1568). This sale occurred after
3 Defendant drove Chad back to Arizona where Chad had some vials "stashed" (#269 at 1570-71).
4 Eventually, Defendant stripped the labels off of these vials (#430 at 1586, 1590-91). It was
5 Defendant who eventually paid for those vials (#430 at 1596). According to Mr. Seldon, it was
6 Defendant who "convinced [him] that the relationship with Chad Livdahl was too profitable to end"
7 (#270 at 2133).
8    No actual conflict adversely affected Palazzo's performance because, given the staggering
9 weight of the above evidence, blaming it all on Mr. Seldon is simply not a plausible defense strategy.
10 No hearing is necessary, and no relief will issue under this claim.
11    B. Independently Negotiating Defendant's Case
12    Defendant alsoalleges that Mr. Palazzo prevented her from independently negotiating her
13 case and testifying for the Government. However, according to Mr. Palazzo, Defendant "indicated
14 that she would not enter a plea to any felony, nor would she agree to serve a custodial sentence as
15 part of any negotiation" (#415 Ex. E ¶5). Mr. Palazzo further asserts that he never "refuse[d] to
16 attempt to plea bargain her case. In reality, there were no negotiations being offered or invited by the
17 prosecutor[.]" (#415 Ex. E at ¶15). This is unsurprising given Defendant's prior refusal to
18 countenance a plea bargain which required her to provide adverse information about her husband
19 (#38 at 2). The Government is quick to clarify that Defendant failed to attend or reschedule a meeting
20 arranged early on in the case, and that no formal plea was ever offered. (#415 at 16 n.5).
21    In addition, Mr. Palazzo's statements are clearly supported by Defendant's own assertions.
22 Defendant claims she "would have testified that her husband was abusive, that she did not go around
23 the clinic that often, and that Dr. Seldon controlled everything, and that she had no knowledge that
24 there was misbranding[.]" (#345 at 7). To the extent such testimony is even relevant, it would be
25
26
                                                    7

worthless to the Government, and potentially inadmissible under Federal Rule of Evidence 602. Defendant would essentially be testifying that she has no personal knowledge of the crimes at issue.

Again, a conflict adversely affects counsel's performance if there was "some plausible alternative defense strategy or tactic might have been pursued but was not . . . " Wells, 394 F.3d at 733. Negotiation requires two parties, and there is simply no meaningful evidence that the Government was interested in negotiating Defendant's case. Accordingly, there was no plausible alternative defense tactic for Mr. Palazzo to pursue. Given the above information and the Court's clear recollection of Defendant's unwavering commitment to a unified front with Mr. Seldon, no hearing is necessary and no relief is permissible under this ground.

II. Ineffective Assistance of Counsel

A. Legal Standard

To obtain relief under this claim, Defendant must meet two difficult burdens. First, that defendant's counsel's representation fell below an objective standard of reasonableness, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 687 (1984). Second, that this deficient performance prejudiced the defense such that the result of the trial is unreliable. Id.

As to deficient performance, "[j]udicial scrutiny . . . must be highly deferential. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (internal quotation omitted). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (internal quotation omitted) (citing

Strickland, 466 U.S. at 690). This question is answered by looking to "the objective reasonableness of counsel's performance." Id. at 790.

As to prejudice, "[i]t is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Id. at 787. "Counsel's errors must be so serious as to deprive the defendant of a fair trial, [meaning] a trial whose result is reliable." Id. at 787-88 (internal quotation omitted) (citing Strickland, 466 U.S. at 687).

### B. Analysis

At the outset, the Court notes that "[s]urmounting Strickland's high bar is never an easy task." Harrington, 131 S. Ct. at 788. Here, Defendant's burden is even more difficult because of the "overwhelming evidence of [Defendant's] guilt at trial."[4] (#312 at 4).

#### i. Not Putting Defendant On the Stand

Defendant alleges that Mr. Palazzo provided ineffective assistance of counsel by failing to put Defendant on the witness stand. Turning to the question of deficient performance, Mr. Palazzo explains his tactical decision not to place Defendant on the stand. "I began to grow concerned regarding her ability to effectively testify and questioned the wisdom of putting her on the stand and subjecting her to cross-examination . . . ." (#415 Ex. E at ¶8). Palazzo had a "serious concern" regarding "her ability to maintain control over herself" and further felt that "she would make a very poor witness on the stand and would not be well received by the jury" ((#415 Ex. E at ¶11). The Court agrees with Mr. Palazzo's assessment. Additionally, a "strategic decision was made, in an effort to try to downplay [Defendant's] role in the case, and a conscious effort was made to minimize her perceived involvement in the case as it unfolded during the presentation to the jury . . . ." (#415 Ex. E at ¶18). Such tactical decisions fall well within the broad latitude afforded to trial counsel. Accordingly, no deficient performance can be found and no relief can issue.

---

[4] While the Ninth Circuit was first in describing the evidence of Defendant's guilt as "overwhelming," the Court candidly and completely agrees.

However, even if deficient performance was found, Defendant acknowledges there was no resulting prejudice by her own refreshingly blunt admission: "Obviously, [Defendant's] truthful testimony would have been devastating to her case . . . ." (#345 at 7). The Court agrees here also.

The primary testimony Defendant claims she would have given is relative to the checks made out to "cash." The Seldons hoped to offer these checks to bolster the claim that they were purchasing sufficient legitimate Botox® to cover the number of units injected. However, all such checks which contained a reference to Botox® were admitted as evidence (#431 at 2009-17, #269 at 1277). Only checks without any reference to Botox® were excluded. Given the breadth and depth of the evidence of Defendant's guilt, any such unsubstantiated claim that the checks were used to purchase genuine Botox® could not alter the outcome of the trial.

Defendant also claims she would have testified essentially that she was not involved and knew nothing about any of the relevant crimes. As demonstrated above, such testimony would have destroyed Defendant's credibility given the overwhelming evidence of her involvement. Further, it would have subjected her to the risks of cross-examination Mr. Palazzo feared. These claims are also largely cumulative with Mr. Seldon's testimony (#431 at 1986; #270 at 2212). Finally, Mr. Palazzo addressed these claims in his closing argument: "You heard that [Defendant] has no medical training whatsoever. No medical education. Never injected any patients. Never went back and participated in the injection of any patients . . .. That - - that's something that is unrefuted." (#273 at 2367). Accordingly, Defendant's failure to testify did not prejudice her case. All remaining proposed testimony is irrelevant, including testimony regarding Mr. Seldon's alleged abusiveness. For all of the above reasons, no hearing is necessary and no relief is permissible on this ground.

ii. The Wedding Ring

Defendant claims that Mr. Palazzo provided ineffective assistance of counsel in accepting her wedding ring as collateral against the fees she owed him. Defendant cannot show that

10

this was deficient performance. Attorneys are entitled to be paid, and accepting a wedding ring as collateral does not "amount to incompetence." Furthermore, it strains credulity to argue that accepting a wedding ring as collateral could make the result of any trial unreliable. Given the overwhelming evidence of guilt in this case, there is simply no good faith argument to be made. In addition, "[Defendant] wore another wedding ring at trial in the place of the ring that was provided to counsel as an offset against fees owed to the Firm." (#415 Ex. E at ¶15). No hearing is necessary and no relief can issue under this claim.

### iii. The Stability of the Marriage

Defendant claims that Mr. Palazzo provided ineffective assistance of counsel because he "left untouched" the impression that Defendant was "close" with Mr. Seldon. (#345 at 8). Defendant claims that "[i]t is an easier reach for a jury to believe that a husband and wife are acting in concert if they are 'two people pulling the train, rather than the truth, which is that she was not acting in concert with him." (#345 at 7) (internal closing quotation mark missing in original). As to deficient performance, when two co-defendants who are also business partners and spouses determine to present a unified front, it is well within the wide latitude afforded to trial counsel not to destroy that unity in the jury's minds. No deficient performance can be found on this claim. Further, given the overwhelming evidence of Defendant's guilt, it was not her "closeness" with Mr. Seldon which resulted in her conviction. No prejudice resulted from this supposed "error." Accordingly, no hearing is necessary and no relief will issue on this claim.

## III. Defendant's Amended Motion

Here, Defendant simply "joins the six claims raised by Dr. Seldon in docket #389 and identified herein. She does not join Dr. Seldon's second and fifth claims." (#391 at 3). Further, rather than set forth independent statements of fact which would justify relief, Defendant merely recites that "the facts set forth by Dr. Seldon apply equally to [Defendant.]" (#391 at 2-3). Mr. Seldon's claim (#389) has been denied in this Court's Order #432.  In addition, this anemic approach bilks the

requirement that Defendant "state the facts that support each ground." Sect. 2255 Forms, ¶9. Accordingly, it is unclear that Defendant has even met the pleading requirements predicate to consideration. However, construing Defendant's motion generously, and to avoid another statement of facts like that submitted in Defendant's original motion, the Court will consider each ground. Having already addressed the substance of these claims in depth, the Court will address each ground here only briefly.

### A. Ineffective Assistance of Counsel

As discussed above, to obtain relief under this claim, Defendant must meet two difficult burdens. First, that Defendant's counsel's representation fell below an objective standard of reasonableness, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Strickland, 466 U.S. at 687. Second, that this deficient performance prejudiced the defense such that the result of the trial is unreliable. Id.

#### i. Mr. Seldon's Claim One (A): Units Administered Versus Units Available

Like Mr. Richards, Mr. Palazzo maintains that he reviewed the discovery in this matter (#415 Ex. E at ¶19). Further, Mr. Palazzo challenged the accuracy of the unit calculations (#273 at 2381-83). It should be noted that while Richards' challenges to the accuracy of the summary chart are irrelevant to deficient performance by Palazzo, they directly impact any possible prejudice by ensuring the deficiency complained of was addressed to the jury. Accordingly, as in Order #432 at 6-7 and for the same reasons as well as those briefly discussed here, no hearing is necessary and no relief may issue under this claim.

#### ii. Mr. Seldon's Claim One (B): Alteration of Patient Records

Like Mr. Richards, Mr. Palazzo maintains that he reviewed the discovery in this matter (#415 Ex. E at ¶19). Further, it remains undisputed that the term "Botox®" was used both

before and after these records were altered (#431 at 156-157). Accordingly, as in Order #432 at 7, and for the same reasons, no hearing is necessary and no relief may issue under this claim.

### iii. Mr. Seldon's Claim One (C): Low Advertised Price for Botox®

Like Mr. Richards, Mr. Palazzo maintains that he reviewed the discovery in this matter (#415 Ex. E at ¶19). As above, although irrelevant to deficient performance, Richards' efforts regarding the pricing evidence further foreclose any showing of prejudice. Further, Mr. Palazzo did challenge the pricing evidence (#273 at 2387). Accordingly, as in Order #432 at 7-8 and for the same reasons as well as those briefly discussed here, no hearing is necessary and no relief may issue under this claim.

### iv. Mr. Seldon's Claim One (D): The "Secret Sale"

Like Mr. Richards, Mr. Palazzo maintains that he reviewed the discovery in this matter (#415 Ex. E at ¶19). As above, although irrelevant to deficient performance, Richards' efforts regarding the secret sale and discrediting Chad Livdahl's testimony further foreclose any showing of prejudice. In addition, Mr. Palazzo himself challenged the accuracy of Chad Livdahl's testimony (#273 at 2378-80). Accordingly, as in Order #432 at 8-9 and for the same reasons as well as those briefly discussed here, no hearing is necessary and no relief may issue under this claim.

### v. Mr. Seldon's Claim Three: Failure to Investigate

Mr. Palazzo maintains that he did investigate this matter (#415 Ex. E at ¶19). Further, although Mr. Richards' efforts apply to prejudice and not to deficient performance, as in Order #432 at 9 and for the same reasons, no hearing is necessary and no relief may issue under this claim.

### vi. Mr. Seldon's Claim Four: The Florida Incident

As in Order #432 at 9-10 and for the same reasons, no hearing is necessary and no relief may issue under this claim.

///

///

1           vii. Mr. Seldon's Claim Six: Loss Amount Calculations

2           Like Mr. Richards, Mr. Palazzo maintains that he reviewed the discovery in this

3  matter (#415 Ex. E at ¶19). Further, Mr. Palazzo challenged the accuracy of the unit calculations

4  (#273 at 2381-83). Accordingly, as in Order #432 at 11 and for the same reasons as well as those

5  briefly discussed here, no hearing is necessary and no relief may issue under this claim.

6       B. Due Process Challenges

7           "Issues disposed of on a previous direct appeal are not reviewable in a subsequent § 2255

8  proceeding." United States v. Currie, 589 F.2d 993, 995 (9th Cir. 1979). And, "[w]here a defendant

9  has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in

10 habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice' or that he is

11 'actually innocent'." Bousley v. United States, 523 U.S. 614, 622 (1998) (internal citations omitted).

12          Defendant has not–and cannot successfully–allege that she is actually innocent. Accordingly,

13 Defendant must demonstrate "cause" for failing to raise her claims on direct appeal, and also that

14 these alleged errors "worked to [her] *actual* and substantial disadvantage, infecting [her] entire trial

15 with error of constitutional dimensions." United States v. Braswell, 501 F.3d 1147, 1150 (9th Cir.

16 2007) (citing U. S. v. Frady, 456 U.S. 152, 170 (1982)) (emphasis in original).

17              i. Mr. Seldon's Claim Seven: The Government's Failures

18          This claim and each of its four sub-parts are based on conduct by the Government and

19 not by Defendant's counsel. Accordingly, as in Order #432 at 12-13 and for precisely the same

20 reasons, the Court cannot reach the merits of the claim. No hearing is necessary and no relief is

21 permissible under this claim.

22              ii. Mr. Seldon's Claim Eight: Chad Livdahl's Testimony

23          This claim is based solely on the conduct and character of Chad Livdahl and not on

24 that of Defendant's counsel. Accordingly, as in Order #432 at 13-14 and for precisely the same

25

26
                                              14

reasons, the Court cannot reach the merits of the claim. No hearing is necessary and no relief is permissible under this claim.

IV. Defendant's Motions for Certificate of Appealability

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Defendant fails to make this showing for all of the above reasons.

V. Conclusion

In accordance with the above analysis, the Court **HEREBY DENIES** Defendant's Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (#345). The Court **FURTHER DENIES** Defendant's Amended Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 (#391). The Court also **HEREBY DENIES** Defendant's Motions for Certificate of Appealability (##386, 387).

DATED this 6th day of February 2014.

_____
Kent J. Dawson
United States District Judge